CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

DEC 22 2005

JOHN F. CORCORAN, CLERK
BY:
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ABINGDON DIVISION

KATHY L. HALE,            )
    Plaintiff,           )
                    )
v.                    )
                    )    Civil Action No. 1:04cv00054
KEMPER NATIONAL SERVICES,  )    **MEMORANDUM OPINION**
INC., et al.               )
    Defendants.         )
                    )
                    )    By:    GLEN M. WILLIAMS,
                    )    Senior United States District Judge

Plaintiff, Kathy L. Hale, ("Hale"), filed this action challenging the final decision of defendants denying Hale's claim for long-term disability, ("LTD"), benefits under a plan governed by the Employee Retirement Income Security Act, ("ERISA"), 29 U.S.C. § 1001, *et seq.* Jurisdiction of this court is pursuant to 29 U.S.C.A. § 1132(f) (West 2003).

*I. Background and Facts*

Hale was employed by American Electric Power, ("AEP"), as a utility worker from July 8, 1991, until she was promoted to equipment operator-C on December 30, 1995, and then again promoted to equipment operator-A on November 16, 1996. (Administrative Record, ("R"), at 3.) Hale participated in AEP's employee welfare benefit plan, ("the Plan"), which was insured by AEP, administered through defendant Broadspire Services, ("Broadspire") (formerly Kemper National Services),

-1-

and governed by ERISA. (R. at 401, 421, 472.) The Plan provides certain benefits in the event of disability upon receipt of proof that a participant is disabled. (R. at 416.) The Plan provides that "total disability" means that due to an accidental bodily injury, sickness or mental illness, a participant is prevented from performing the essential duties of her occupation. (R. at 406, 466.) After 24 months of total disability, a participant is eligible for continued LTD benefits if she is "prevented from performing the essential duties of any occupation for which [she] is qualified by education, training, or experience." (R. at 466.) LTD benefits are 60 percent of an employee's base monthly income. (R. at 415.) In order to receive benefits, the plan states that the participant must be under the regular and continuing care of a doctor who is not a member of her immediate family. (R. at 466.)

In delineating the Plan administrators' authority, the Plan provides Broadspire with the authority to review and process initial benefit determinations and first-level appeals, while it vests the authority to administer second-level appeals to the AEP Long-Term Disability Plan Claims Appeal Committee, ("Appeal Committee"). (R. at 472-73.) If a participant is dissatisfied with the initial benefit determination, she may informally contact Broadspire to review her claim, or she may immediately pursue a first-level appeal. (R. at 484-85.) The review of first-level appeals affords no deference to the initial benefit determination and is conducted by someone other than an individual involved in the initial benefit determination or a subordinate of such an individual. (R. at 484.) If a claim is denied based on a medical judgment, Broadspire will consult a health professional with appropriate training and experience and also identify medical or vocational experts whose advice was obtained on behalf of the Plan in connection with the adverse benefit determination. (R. at 484.) Like first-

level appeals, the review of second-level appeals affords no deference to the determination of the first-level appeal and is conducted by someone not involved in the review of the first-level appeal. (R. at 485.) If a claim is denied based on a medical judgment, the Appeal Committee utilizes an independent external review organization with medical professionals generally certified in the speciality of the issue of the appeal. (R. at 485.)

The record shows that Hale filed her application for LTD benefits on or about July 24, 1998, due to two ruptured discs in her neck, numbness and burning in her left hand, numbness in her right hand, neck pain and back pain. (R. at 4-5.) Effective August 23, 1998, Broadspire granted Hale LTD benefits. (R. at 21-22.) However, these benefits were discontinued effective January 1, 2003, based on a determination that Hale was not disabled from "any occupation for which [she was] qualified by education, training or experience." (R. at 91-92.) This decision was based, in part, on general peer reviews conducted by Dr. Dennis Mazal, M.D, and Dr. Lawrence Burnstein, M.D. (R. 315-32, 348, 362-66.) Hale appealed this determination to Broadspire, but on March 26, 2003, the original termination was upheld in reliance on peer review analyses conducted by Dr. Robert Ennis, M.D., on March 14, 2003, and Dr. Elana Mendelssohn, Psy. D., on March 17, 2003. (R. at 333-46.) Dr. Mendelssohn concluded that Hale was not totally disabled and based her decision, in part, on Hale's self-reports of improvement and the fact that she had not seen her therapist recently. (R. at 342.) Dr. Mendelssohn noted,

> [m]ost of the documentation submitted addresses the claimant's medical treatment prior to time frame in question. The documentation which pertains to the time frame in question is quite limited and overall does

-3-

not provide objective examination findings or behavioral observations to substantiate the presence in psychological functioning. Although the claimant may be experiencing emotional difficulties, these appear situational and there is no evidence of global impairment.

(R. at 342.) Hale then appealed to AEP's Appeal Committee, which utilized a peer review analysis conducted by Dr. Leela Rangaswamy, M.D, which concluded that Hale's medical documentation did not identify any objective clinical or functional deficits that would substantiate total disability status from the date cited. (R. at 374-77, 397.) Dr. Rangaswamy denied a conflict of interest and indicated that no more than five percent of her income was derived from AEP. (R. at 381.) The Appeal Committee affirmed the discontinuance of LTD benefits on June 12, 2003. (R. at 371-72.) Hale then filed this action seeking review of the Appeal Committee's unfavorable decision. The case is now before the court on Hale's motion for summary judgment filed February 15, 2005, (Docket Item No. 23), and defendants' motion for summary judgment filed March 31, 2005. (Docket Item No. 32.)

## II. Facts

On July 17, 1998, Dr. S.C. Kotay, M.D., completed an Attending Physician's Statement for Hale. (R. at 16-17.) Dr. Kotay found suggested blocked vertebrae at C5-C6, two levels of degenerative disc disease and moderate spinal canal stenosis and diagnosed Hale with degenerative joint disease and spinal canal stenosis. (R. at 16.) Dr. Kotay indicated that Hale could need a cervical disc excision in the future. (R. at 16.) Dr. Kotay further found Hale's status to be ambulatory and determined that Hale had a class five impairment, imposing a severe limitation of functional capacity that made Hale incapable of sedentary work. (R. at 17.)

-4-

Hale visited Stone Mountain Health Services, ("Stone Mountain"), on July 23, 1998, where she relayed Dr. Kotay's findings and other prior findings that indicated she suffered from bilateral carpal tunnel syndrome. (R. at 202.) Dr. Bickley Craven, M.D., assessed Hale with allergic rhinitis with chronic drainage, cervical disc disease with apparent rupture and carpal tunnel syndrome. (R. at 202.) Dr. Craven prescribed Entex and Flexeril for Hale. (R. at 202.)

On November 4, 1998, Hale underwent surgery on her neck by Dr. Ken Smith, M.D. (R. at 26.) Dr. Smith removed two of Hale's discs that had been fused since birth and replaced them with bone, a steel plate and screws. (R. at 26.) Dr. Smith previously had performed a carpal tunnel release for Hale. (R. at 26.)

On February 8, 1999, Hale visited Stone Mountain feeling upset and despondent. (R. at 201.) During her appointment, Hale began crying spontaneously and indicated that she had been feeling depressed. (R. at 201.) Hale also reported irritability with her children, which was unlike her. (R. at 201.) Dr. Craven prescribed Prozac for Hale's symptoms. (R. at 201.)

On March 18, 1999, Hale returned to Stone Mountain, where she reported that she no longer experienced crying spells and her depression had improved. (R. at 198, 200.) Dr. Craven noted that Hale's affect was brighter, although he diagnosed her with significant depression, sexual dysfunction, muscle spasms in the neck and back and status post fusion of the cervical spine. (R. at 198.) Dr. Craven continued Hale's use of Prozac and gave her a trial of amantadine for her sexual dysfunction. (R. at 198, 200.)

Hale returned to Stone Mountain on April 27, 1999, for treatment of her depression. (R. at 196.) She reported that she was feeling well emotionally but had been experiencing more pain in her back and neck, which aggravated her emotional stability. (R. at 196.) Hale reported that she could not discern whether Amantadine helped her sexual dysfunction or whether glucosamine helped her back and shoulder pain. (R. at 196.) Upon examination, Dr. Craven noted that Hale appeared uncomfortable, and there was pain to palpation over the neck, paracervical muscles bilaterally in the neck and in the trapezius muscle. (R. at 196.) Dr. Craven assessed Hale with continued back and neck pain with spasm and depression and recommended that Hale visit Dr. Ahmed to follow up on her back and neck pain. (R. at 196.)

On May 11, 1999, Judy E. Lockridge, R.P.T., from Lebanon Physical Therapy completed a Functional Capacity Evaluation on Hale. (R. at 278-93.) Hale reported that as a result of her carpal tunnel release and cervical decompression surgery, she continued to experience pain and/or physical limitations to the following anatomical areas: 1) some stiffness in her neck region, 2) burning pain in the upper biceps, radiating into the forearm and occasionally into the second, third and fourth finger on the left, 3) constant burning and aching and interscapular pain on the left, 4) weak grip strength in the left hand, and 5) low endurance when performing activities of daily living. (R. at 280.) When describing why she believed she could not return to her position as an operator, Hale expressed concern about the amount of pushing, pulling and lifting force that would be required. (R. at 280.) Lockridge performed numerous tests on Hale, and one out of eight tests suggested possible symptom magnification, while two out of three tests questioned Hale's full physical effort. (R.

-6-

at 291.) Lockridge noted that Hale did better with distraction-based testing, which could indicate that she feared pain or force in using her left hand. (R. at 291.) Tests performed to determine Hale's physical capabilities revealed that Hale had functional grip strength in her left hand, the capability to push and pull 30 pounds of force but not weight, slower than average coordinated ability in regard to fine motor coordination, an inability to work overhead due to subjective complaints, a capability of lifting 20 pounds from floor to shoulder occasionally and 15 pounds on a frequent basis, functional cervical and shoulder range of motion, but full range not available, sustained neck flexion tolerance for 45 minutes and sustained sitting tolerance for two hours. (R. at 292-93.) Lockridge recommended a work conditioning program consisting of performing functional tasks and requiring sustained neck flexion, overhead work, reaching forward and pushing/pulling for one hour up to four hours per day. (R. at 293.)

On June 3, 1999, Hale visited Stone Mountain, where she reported that her depression had improved. (R. at 195.) Regarding her physical pain, Hale reported that Neurontin helped, although she still experienced some burning down her arm, and glucosamine worked well for her shoulder pain. (R. at 195.) Dr. Craven noted that Hale still did not feel well despite her weight loss since her surgery. (R. at 195.) Dr. Craven assessed Hale with depression and chronic neck/back pain, continued Hale's use of Prozac and prescribed Amoxil. (R. at 195.)

Over the next few months, Hale's medications were adjusted through Stone Mountain, so that she began Lortab and Entex and continued her use of Prozac and Valium. (R. at 194.) Stone Mountain records indicate that during this time period,

Hale also visited Dr. Ahmad and received a diagnosis of tendinitis in the shoulder. (R. at 194.) Dr. Ahmad gave Hale steroid shots in her shoulder, but she still experienced pain and spasms in her arms and back. (R. at 194.)

On August 12, 1999, Hale visited Sone Mountain for a follow-up appointment. (R. at 192.) Hale informed Dr. Craven that Dr. Smith, her orthopedic surgeon, had indicated that nothing more could be done for her neck pain from a surgical standpoint. (R. at 192.) Hale also reported that she continued to suffer from depression, so upon Dr. Ahmed's advice, she had increased her dosage of Prozac. (R. at 192.) Hale indicated that her current medications were Neurontin, Soma, Celebrex, Lortab, Valium and Prozac. (R. at 192.) Dr. Craven's assessment included diagnoses of chronic neck and shoulder pain, status post cervical laminectomy, depression, obesity and hypertension. (R. at 192.) Dr. Craven prescribed Wellbutrin for Hale and encouraged her to consider counseling. (R. at 192.)

Hale returned to Stone Mountain on August 30, 1999, for treatment of her back and neck pain. (R. at 190.) Hale complained of increased pain in these areas and continued muscle spasms between her shoulder blades and trapezius muscles. (R. at 190.) Hale commented that the shooting pains in her left arm had subsided since she began Neurontin. (R. at 190.) Hale also complained of symptoms of depression, including increased crying, sexual dysfunction and lethargy. (R. at 190.) An examination revealed that Hale's affect was depressed, and there was tenderness over her trapezius muscles and some tenderness over the paraspinal muscles near the left scapula. (R. at 190.) Dr. Craven further noted that Hale's DTR's were symmetrical, and her upper extremity strength was symmetrical in the upper extremities. (R. at

-8-

190.) Dr. Craven assessed Hale with chronic neck pain secondary to trauma, depression and muscle spasm. (R. at 190.) Dr. Craven instructed Hale to taper down her use of Prozac, started Hale on Serzone and recommended counseling. (R. at 190.)

On September 14, 1999, Hale visited Stone Mountain for pain management and treatment for her depression. (R. at 189.) Hale reported that her pain was persistent and she had experienced a severe headache a few days prior. (R. at 189.) Hale also complained of sinus symptoms and depression. (R. at 189.) Dr. Craven diagnosed Hale with a sinus infection, depression and chronic pain in the neck and shoulders. (R. at 189.) Dr. Craven prescribed Amoxil and Oxycontin, recommended Hale use Nasalcrom over-the-counter spray, continue her use of Entex, increase her use of Serzone, restart Wellbutrin and use Lortab as needed. (R. at 189.)

Hale presented to Stone Mountain on September 30, 1999, with complaints of shortness of breath and wheezing. (R. at 188.) Hale also complained of neck and back pain, for which Dr. Craven continued her use of Oxycontin and instructed her to take Lortab for a week. (R. at 188.) An examination revealed that Hale's affect was depressed but that her ears and throat were unremarkable. (R. at 187.) Hale's lungs showed some mild wheezing but no rales. (R. at 187.) Dr. Craven further noted that Hale had good air movement but with prolonged expiration and some tenderness over the costochondral junctions. (R. at 187.) Dr. Craven assessed Hale with bronchospasm, continued respiratory infection, chronic neck and back pain and depression. (R. at 187.) Dr. Craven noted that Hale was no longer taking Prozac for her depression, continued Hale's use of Wellbutrin, increased her use of Serzone and gave her Z-pak and an Albuterol inhaler (R. at 187-88.)

-9-

On October 12, 1999, Hale visited Stone Mountain for a follow-up appointment for her cough and wheezing. (R. at 185.) Hale complained of a knot on the left side of her neck, fever, cough, continued drainage in the back of her throat and dysuria. (R. at 185.) Hale stated that the Albuterol inhaler had helped her lungs and the Oxycontin had eased her pain but that the hydrocodone caused drowsiness. (R. at 185.) Dr. Craven's examination revealed that Hale's cough was congested and tight, her throat was somewhat red and there was some lymphadenopathy under the left anterior cervical and left submandibular area. (R. at 185.) Hale's lungs showed some scattered wheezing throughout but no definite rales. (R. at 185.) A urinalysis was positive, and Hale's WBC's were at 20 to 25 with a few epithelia cells. (R. at 185.) Dr. Craven diagnosed Hale with continued sinus symptoms and bronchitis, continued wheezing, a urinary tract infection, chronic pain and significant depression related to the chronic pain. (R. at 185.) Dr. Craven continued Hale's medications, increased her use of Oxycontin and prescribed Cipro. (R. at 185.)

Dr. Craven also completed an Estimated Functional Capacities Evaluation for Hale on October 12, 1999. (R. at 36-38.) Dr. Craven determined that Hale could sit for less than one hour in an eight-hour workday, stand for less than one hour in an eight-hour workday and walk for less than one hour in an eight-hour workday. (R. at 36.) Dr. Craven further estimated that Hale needed breaks every 30 minutes. (R. at 36.) Dr. Craven indicated that Hale could occasionally lift items weighing up to 10 pounds but could never lift items weighing more than 10 pounds, carry, bend/stoop, squat, crawl, climb, reach above, crouch, kneel, balance or push/pull. (R. at 36-37.) Dr. Craven found that Hale could use her hands for simple grasping and

-10-

fine manipulating but not for pushing and pulling. (R. at 37.) Dr. Craven also found that Hale could not use her feet for repetitive movements, such as operating foot controls, or use her hands and neck in any position. (R. at 37.) In conclusion, Dr. Craven opined that Hale could not work and was totally disabled. (R. at 37.)

Dr. Craven completed an Attending Physician's Statement for Hale on October 25, 1999. (R. at 34-35.) Dr. Craven diagnosed Hale with chronic cervical radiculopathy, cervical spondylosis at the C4-5 and C5-6 levels, chronic muscle spasms and pain. (R. at 34.) Dr. Craven also noted that Hale suffered from asthma and severe depression. (R. at 34.) Dr. Craven indicated that Hale obtained a good surgical result but not a good functional result, yet he was hopeful for Hale's prognosis, although it would require an aggressive pain management program. (R. at 34.) Hale's physical impairment was classified as class five, indicating a severe limitation of functional capacity and an incapability of sedentary work, while her mental/nervous impairment was classified as class four, indicating a marked limitation and an inability to engage in stress or interpersonal relationships. (R. at 35.)

Hale completed a LTD Claim Questionnaire. (R. at 41-45.) Hale explained that she could not perform the duties of her occupation because of pain in her back, neck and arms. (R. at 41.) Hale further indicated that she could not engage in any gainful employment because of pain in her neck, back, shoulders and arms, headaches and nerve damage in her left arm and the left side of her face. (R. at 41.) In describing her daily activities, Hale indicated that she sometimes helped with the household shopping and cooking but that her family did most of the cooking,

-11-

cleaning and laundry. (R. at 44.) Hale stated that she drove only when she was forced, because it was difficult to turn her head. (R. at 44.) Hale also indicated that she attended church services, walked on a treadmill once or twice a week, played the guitar, sang and did arm and neck exercises. (R. at 44.) Hale stated that she had difficulty sleeping because of pain in her neck, back and arms, muscle spasms in her neck and back, headaches and carpal tunnel syndrome in her right hand. (R. at 44.) Hale listed that her current medications were Neurontin, Vioxx, Singular, Albuterol, Valium, hydrocodone, Oxycontin, Remeron, Atrovent and Wellbutrin, some of which caused drowsiness, a decreased sex drive, grouchiness, nervousness, swelling in her arms, legs, face and stomach, memory loss, weight gain and irritability. (R. at 45.)

On April 6, 2000, Hale had images taken of her sacrum coccyx at Johnston Memorial Hospital, which showed no evidence of fracture or other bony abnormality. (R. at 126.) Hale also submitted for x-rays on May 22, 2000, at Abingdon Radiology Services, Ltd., that revealed no bone or joint abnormality in her right hip. (R. at 125.)

Hale completed an intake assessment at Abingdon Center for psychiatry, counseling and education on June 22, 2000. (R. at 225-28.) Hale indicated that she suffered from sleep problems, decreased energy and crying spells. (R. at 226.) Lynda Warner, C.S.W., diagnosed Hale with a major depressive disorder that was recurrent and severe and severe chronic pain and devised a strategy that included individual bimonthly therapy to reduce Hale's depressive symptoms, to help Hale manage stress and to find ways for Hale to feel useful and independent. (R. at 228.) Hale attended individual therapy at Abingdon Center on July 24, 2000, August 23, 2000, September 28, 2000, November 21, 2000, January 2, 2001, February 4, 2001, July 31, 2001,

-12-

August 27, 2001, November 26, 2001, January 2, 2002, January 29, 2002, February 26, 2002, April 1, 2002, September 4, 2002, October 7, 2002, November 4, 2002 and January 15, 2003.  (R. at 214-24.)

Upon the request of AEP and Kemper, on July 31, 2000, Hale submitted for an independent medical evaluation from Dr. Neal A. Jewell, M.D. (R. at 253-57.) Dr. Jewell noted that Hale was remarkably obese.  (R. at 255.)   Dr. Jewell reviewed x-rays from Russell County Medical Center and determined that Hale's objective data supported her subjective complaints.  (R. at 255-56.)  Dr. Jewell indicated that the x-rays indicated remarkable C3-4 degenerative disc disease extending back prior to her surgical treatment, which changes have worsened over time and were significantly worse than they were prior to the surgery.  (R. at 256.)  Dr. Jewell further noted that Hale would probably continue to have chronic neck and shoulder girdle pain, and it was unlikely that increasing pain medications would produce significant long-term pain relief.  (R. at 256.)  Dr. Jewell concluded that he did not expect Hale to further improve in her condition; however, he believed that Hale could return to job activities.  (R. at 256.) Dr. Jewell also recommended that Hale's medicinal regime was excessive for a long-term basis and she should taper them down if she was not experiencing remarkable relief with her current medications.  (R. at 257.)

Dr. Jewell also completed an Evaluation Of Physical Abilities form on Hale for Broadspire.  (R. at 258.)  Dr. Jewell found that Hale could perform sedentary and light work at full capacity, while she could infrequently perform moderate work at partial capacity.  (R. at 258.)  Dr. Jewell determined that Hale could not perform heavy work.  (R. at 258.)  Dr. Jewell limited Hale's pulling/pushing and carrying to

-13-

items weighing 30 pounds. (R. 258.) Dr. Jewell also found that Hale could walk for one hour at a time during a six-hour workday, stand for one hour at a time during a six-hour workday and sit for two hours at a time in a seven-hour workday. (R. at 258.) Dr. Jewell further determined that Hale's ability to stoop, kneel, bend repeatedly, operate an automobile and use fine finger dexterity was at partial capacity, while she was at full capacity in her ability to tolerate part-time work, grasp and use gross manual dexterity. (R. at 258.) Dr. Jewell found that Hale could not climb or operate heavy equipment. (R. at 258.)

Hale returned to Stone Mountain on August 1, 2001, with complaints of continued neck discomfort. (R. 183-84.) Hale also complained of shoulder pain, which was alleviated with Oxycontin to the extent where she could work around the house. (R. at 183.) With regard to her depression, Hale indicated that she had good days and bad days. (R. at 183.) Hale also complained of headaches. (R. at 183.) Dr. Craven diagnosed Hale with depression, chronic hoarseness and obesity. (R. at 184.)

On August 30, 2001, Hale returned to Stone Mountain for a check-up. (R. at 180-81.) Dr. Craven diagnosed Hale with chronic neck pain, for which he continued her medications and suggested she visit Dr. Ahmed for injections in her joints, headaches, asthma, hoarseness, gastroesophageal reflux disease, ("GERD"), and obesity. (R. at 180.)

A transferable skills analysis was performed on September 1, 2000, using the Dictionary of Occupational Titles, ("DOT"), the Occupational Access System, ("OASYS"), and the results of Dr. Jewell's Evaluation Of Physical Abilities, dated

-14-

July 31, 2000, to determine whether Hale was able to perform any job for which she was, or could have become, qualified based on her previous training, education and/or experience. (R. at 298-300.) The field care manager, Matthew W. Jones, determined that there were jobs available to Hale that met the requirements of her disability plan, including jobs as a school bus monitor, which paid $6.00 per hour, blending tank tender helper, which paid $7.77 per hour, a gate guard, which paid $6.00 per hour and a front desk clerk at a hotel or motel, which paid $8.55 per hour. (R. at 300.) A later review of this transferable skills analysis revealed that there were no jobs available for Hale because of the needed hourly wage; therefore, Broadspire continued Hale's LTD benefits under the plan at this point in time. (R. at 50, 300-01.)

Hale visited Stone Mountain on September 26, 2001, for her monthly check-up. (R. at 179.) Hale reported that she had been seeing a counselor for her depression. (R. at 179.) Dr. Craven assessed Hale with weight gain, asthma and high cholesterol, for which he prescribed Lescol. (R. at 179.)

On October 2, 2001, Hale returned to Stone Mountain for a check-up. (R. at 177.) Hale explained that she had been experiencing severe headaches, some of which lasted for three days. (R. at 177.) Hale described the pain as emanating from behind her eyes and temples. (R. at 177.)

Dr. Patel performed a psychiatric evaluation on Hale on November 12, 2001, and found that Hale did not appear to be in acute pain and was polite, pleasant and cooperative. (R. at 236-37.) Dr. Patel noted that Hale became tearful at times but that her other cognitive functions appeared to be quite intact and normal. (R. at 237.) Dr.

-15-

Patel diagnosed Hale with a major recurrent depressive disorder, possible post-traumatic stress disorder, chronic neck pain and a possible mixed personality disorder. (R. at 237.) Dr. Patel discontinued Hale's use of Remeron, as it made her groggy, prescribed Serzone, increased Hale's use of Wellbutrin and encouraged Hale to work with her therapist to deal with some of her anger and insecurity. (R. at 238.)

Hale returned to Stone Mountain on November 21, 2001, for a check-up, complaining of vomiting, nausea and continued headaches. (R. at 174-75.) Hale indicated that Midrin helped with her headaches, and her other medications alleviated her asthma symptoms. (R. at 175.) Dr. Craven assessed Hale with nausea and unsteady gait, which could have been the side effects of her medication, chronic neck pain, migraine headaches, asthma and severe depression that was aggravated by current stressors and childhood trauma. (R. at 174.) Dr. Craven decreased Hale's dosage of Neurontin and continued Hale's other medications. (R. at 174.)

On December 6, 2001, Dr. Craven completed another Attending Physician's Statement for Hale. (R. at 56-57.) Dr. Craven's diagnoses were identical to those in his earlier statement, although he added that Hale also suffered from allergic rhinitis and obesity. ( R. at 56.) Dr. Craven determined that Hale's prognosis for significant improvement was poor. (R. at 57.) Dr. Craven restricted Hale to lifting objects weighing no more than five pounds and to sitting for no longer than 30 minutes. (R. at 57.)

Dr. Craven also completed an Estimated Functional Capacities Evaluation for Hale on December 6, 2001. (R. at 58-59.) Dr. Craven determined that Hale could sit

-16-

for less than one hour a day with rest, stand for less than one hour a day with rest and walk for less than one hour a day with rest. (R. at 58.) Dr. Craven found that Hale could never lift, carry, bend/stoop, squat, crawl, climb, reach above, couch, kneel, balance, push/pull, use her hands for simple grasping or pushing and pulling, use her feet for repetitive movements such as operating foot controls or use her hands and neck in any position because of her severe neck pain, upper back pain, shoulder pain and her limited range of motion. (R. at 58-59.) Dr. Craven indicated that Hale could occasionally drive an automobile and could use her hands for fine manipulating. (R. at 59.) Dr. Craven placed total restrictions on Hale's activities involving heights, moving machinery and exposure to dust, fumes and gases and moderate restrictions on her ability to drive automotive equipment. (R. at 59.) Dr. Craven concluded that Hale could not work. (R. at 59.)

On December 17, 2001, Hale returned to Stone Mountain for a check-up appointment. (R. at 173.) She reported that she had experienced less nausea and unsteady gait. (R. at 173.) Hale also explained that she had stopped taking Serzone because it had made her too drowsy. (R. at 173.) Dr. Craven diagnosed Hale with chronic headaches, chronic neck pain, obesity, asthma and depression and continued Hale's use of medications. (R. at 173.)

Hale visited Bristol Psychiatry and Psychology Services, P.C., on December 20, 2001, where Dr. Ashvin A. Patel, M.D., noted that Hale appeared less depressed and anxious and had lost more weight. (R. at 235.) Dr. Patel also saw Hale on April 1, 2002, where he found Hale to be stabilizing, euthymic, pleasant and cooperative, less anxious and less depressed. (R. at 233.) Dr. Patel continued Hale on her current

-17-

medications and encouraged Hale to continue seeing her therapist. (R. at 233.)

On April 8, 2002, Hale visited Stone Mountain with complaints of continued back pain and headaches. (R. at 162-63.) Hale explained that her back pain was between her shoulders and into her neck, although it was alleviated some with Oxycontin. (R. at 162.) Hale stated that her headaches were frequent and occurred at the back of her skull and behind her temples. (R. at 162.) Hale also complained of pain that radiated into her left arm and caused weakness in her arms. (R. at 162.) Dr. Craven diagnosed Hale with increased weakness in her arms, chronic neck/upper back pain, depression, asthma, rhinitis, hyperlipidemia, obesity and migraine headaches. (R. at 163.) Dr. Craven restarted Hale on cholesterol medication and ordered a refill of Oxycontin. (R. at 163.)

Upon a referral from Dr. Craven, Hale visited Mountain Empire Neurological Associates, P.C., for a neurologic evaluation on April 25, 2002. (R. at 243-44.) Dr. Steve W. Morgan, M.D., found Hale's neurologic examination normal except for some decreased range of motion in her neck and a report of tenderness in the posterior cervical muscles along the base of her skull. (R. at 243.) Dr. Morgan recommended to Dr. Craven that Hale substitute Depakote for Neurontin. (R. at 244.)

Hale returned to Stone Mountain on June 19, 2002, for a check-up. (R. at 157.) Hale complained of her chronic symptoms but added that her hands had begun drawing three weeks prior. (R. at 157.)

On July 1, 2002, Hale returned to Bristol Psychiatry and Psychology Services

-18-

reporting that her potassium had been low and she had been cramping. (R. at 232.) She also indicated that she felt anxious and depressed but that Wellbutrin and Serzone helped. (R. at 232.) Dr. Patel found Hale to be stable with no increase in the amount of depression or decompensation and continued her medications. (R. at 232.)

On July 17, 2002, Hale visited Stone Mountain for a check-up. (R. at 154-56.) Dr. Craven noted that Hale's asthma was stable with medication. (R. at 155.) Dr. Craven diagnosed Hale with hands drawing, shoulder pain, neck spasm, asthma, improving obesity, chronic neck pain, gastritis and depression. (R. at 154, 156.) Dr. Craven continued Hale's medications, started Hale on Nexium, scheduled an EMG to help evaluate Hale's shoulder, arm and neck pain and injected Hale's shoulder. (R. at 154.)

Hale visited Mountain Empire Neurological Associates on July 18, 2002, for a follow-up on her migraines. (R. at 239-42.) Hale reported that her migraines had improved since she began Depakote, and while Depakote caused nausea, it did not cause her to lose weight. (R. at 239.) The results of a neurologic exam were within normal limits, and Dr. Morgan continued Hale's use of Maxalt and Depakote. (R. at 239.)

On July 30, 2002, Hale completed a LTD Claim Questionnaire. (R. 70-73.) Hale explained that she could not work because of arthritis in her spine, bursitis in both of her arms, burning in her face and left arm, nerves, depression, migraines, sleep difficulty, severe muscle spasms in her back and neck and carpel tunnel syndrome in her left arm. (R. at 70.) Hale listed as her current medications: Soma,

-19-

Valium, Oxycontin, Depakote, Mobic, Maxair, Flovent, Rhinocort, Wellbutrin, Seroquel, Singular, Mazide, Xenical, Albuteral and Nexium. (R. at 70.) Hale explained that she received trigger point injections in both shoulders and her skull. (R. at 70.) In describing her daily activities, Hale indicated that she attended church services twice a month, watched television, prepared small meals and visited her doctors. (R. at 70.) Hale indicated that her daily activities were limited because she had no desire to leave her house, felt irritable and generally did not feel well. (R. at 70.) Hale also explained that she experienced daily vomiting and forgetfulness. (R. at 70.) Hale indicated that she rarely cooked or swept the floors but did fold laundry, climb stairs, read, drive with assistance, dress with little assistance, dust and perform routine hygiene without assistance. (R. at 70.) Hale expressed, however, that she was unable to make the beds, mop, walk for exercise or garden. (R. at 70.)

Dr. Craven completed another Attending Physician's Statement for Hale on August 14, 2002. (R. at 75-76.) Dr. Craven referred to his December 2001 statement in listing Hale's diagnoses but added that Hale also suffered from migraine headaches. (R. at 75.) Dr. Craven indicated that Hale's prognosis was poor and let his earlier restrictions stand. (R. at 76.)

On August 15, 2002, Hale visited Stone Mountain with complaints of severe headaches. (R. at 153.) Hale explained that she had visited the emergency room due to the severity of her headaches, although the Depakote helped. (R. at 153) Hale further stated that her asthma was stable and her stomach felt better with the use of Nexium. (R. at 153.) Dr. Craven assessed Hale with weight loss, migraine headaches, chronic pain, asthma and depression and continued her use of Nexium.

-20-

(R. at 153.)

On August 23, 2002, Hale underwent a hepatobiliary scan at Bristol Regional Medical Center, ("BRMC"), which was negative, and on August 29, 2002, she underwent an abdomen ultrasound at Abingdon Radiology Services, which was also normal. (R. at 124.)

Hale visited Stone Mountain for a check-up on September 9, 2002. (R. at 150-51.) Hale reported that she experienced occasional vomiting and severe migraine headaches. (R. at 151.) Hale explained that she still suffered from back pain and the drawing of her hands. (R. at 151.)

On September 26, 2002, Dr. Craven completed an Estimated Physical Abilities form for Hale. (R. at 79-80.) Dr. Craven determined that Hale could sit for two to three hours with rest but continuously for only 15 to 20 minutes, stand for two to three hours with rest but continuously for only 15 to 20 minutes and could walk for four hours with rest but continuously for only 15 to 20 minutes. (R. at 79.) Dr. Craven also found that Hale could occasionally lift or carry items weighing up to 10 pounds, bend/stoop and kneel, frequently drive an automobile, but could never lift or carry items heavier than 10 pounds, squat, crawl, climb, reach above, crouch, balance or push/pull. (R. at 79-80.) Dr. Craven determined that Hale could use her hands for simple grasping but not for pushing and pulling but it was unknown whether Hale could use them for fine manipulating in light of recent numbness in her hands. (R. at 80.) Dr. Craven further found that Hale could use her feet for repetitive movements as in operating foot controls but only for limited amounts of time. (R. at

-21-

80.) In conclusion, Dr. Craven placed total restrictions on Hale's activities involving unprotected heights, being around moving machinery and exposure to dust, fumes and gases, and mild restrictions on Hale's activities exposing her to marked changes in temperature and humidity or that would require her to drive automotive equipment. (R. at 80.) According to Dr. Craven, "[Hale] ha[d] significant physical disability from chronic pain syndrome s/cervical disc surgery. In addition, significant depression limit[ed] [Hale's] ability to function in social milieu of work environments. In addition, asthma limit[ed] [Hale's] exposure to dust, fumes, etc." (R. at 80.)

On October 29, 2002, Hale visited Stone Mountain with complaints of sleeplessness due to pain in her neck, legs and hands. (R. at 146-47.) Hale also related that she was experiencing three to four migraine headaches per week, which were worse than before she ended her use of Depakote. (R. at 147.) Hale did state, however, that her frequency of vomiting had decreased. (R. at 147.) Dr. Craven suggested the use of Imitrex when Hale felt the onset of a headache and continued Hale's other medications. (R. at 146.)

Hale visited Dr. John W. Whiteley, M.D., on November 12, 2002, for complaints of headaches and neck pain, which were causing sleeplessness. (R. at 100-02.) Dr. Whiteley noted Hale's recent weight gain of 50 pounds. (R. at 101.) Upon a physical examination, Dr. Whiteley found Hale's neck tender over the bilateral occipital areas, the bilateral trapezius and the bilateral rhomboids. (R. at 101.) Dr. Whiteley diagnosed Hale with headaches, neck and shoulder pain with chronic cervical radiculopathy, anxiety, depression and obesity with trouble tolerating medicine due to weight gain. (R. at 101.) Dr. Whiteley instructed Hale on Zanaflex

-22-

in a ramping dose, offered physical therapy, stopped Hale's use of Soma, recommended Hale return for trigger point injections and continued Hale's use of a TENS unit. (R. at 102.)

On November 26, 2002, Hale saw Dr. Whiteley for her increased headaches and arm pain. (R. at 99.) Dr. Whiteley diagnosed Hale with chronic headaches and cervical radiculopathy, increased her use of Zanaflex and gave her a cervical epidural steroid injection. (R. at 99.)

On December 5, 2002, Hale returned to Bristol Psychiatry and Psychology Services, where Dr. Patel found her to be markedly depressed, anxious, tense and fearful, which he surmised were probably situational symptoms. (R. at 231.) Hale reported that she felt better and had not experienced any major side effects from her medication. (R. at 231.) Dr. Patel continued Hale's use of Wellbutrin and Seroquel. (R. at 231.)

Hale underwent another cervical epidural steroid injection for her cervical radiculopathy at the Bristol Surgery Center on December 9, 2002. (R. at 98.) However, despite the recent epidural steroid injections, Hale visited Dr. Whiteley on January 13, 2003, complaining of continued pain in her neck and shoulder. (R. at 95-96.) Dr. Whitley assessed Hale with neck and shoulder pain with history of cervical radiculopathy. (R. at 95.) Dr. Whitley increased Hale's dosage of Zanaflex and gave her trigger point injections of Marcaine and Kenalog. (R. at 95-96.)

At the request of Broadspire, Caralee A. Eicher, a vocational field care

manager, completed an Employability Assessment Report for Hale on December 11, 2002. (R. at 306-09.)  The assessment was based on the results of a job analysis/description provided by AEP; a KNS Comprehensive Peer Review and Addendum completed by Dr. Burnstein, psychologist; a KNS Peer Review Addendum completed by Dr. Maza; a LTD questionnaire; an Attending Physician's Statement by Dr. Craven on August 14, 2002; and a Psychiatric Evaluation completed by Dr. Patel. (R. at 306.)  Eicher found that three of the 17 jobs given as potential job matches for Hale in the Transferable Skills Analysis met the replacement wage requirements. (R. at 308.)  These jobs included the position of auxiliary-equipment operator, which paid $17.22 per hour, the position of electric-meter reader, which paid $14.64 per hour, and the position of service or work dispatcher, which paid $13.12 per hour.  (R. at 308.)

On December 23, 2002, Hale had a regular check-up with Stone Mountain where she complained of aggravated cervical pain that radiated down into her arms. (R. at 145.)  Hale also reported that her medicine and the TENS unit eased her pain a great deal. (R. at 145.)  Hale was assessed with cervical disc disease, chronic pain and depression and instructed to increase her dosage of Oxycontin. (R. at 145.)

Hale visited Stone Mountain on January 22, 2003, complaining of severe headaches that occurred behind her temples and eyes. (R. at 143-44.)  Hale indicated that her stress level was high and she had lost her insurance coverage. (R. at 143.)  Dr. Craven let his earlier diagnoses stand. (R. at 144.)

-24-

### III. Analysis

#### A. Standard of Review

The law governing claims for denial of benefits under ERISA is well-settled. In cases where the plan language grants the administrator discretion to determine eligibility for benefits, as it does in this case, the court may review the administrator's decision only for an abuse of discretion. *Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 232 (4th Cir. 1997). Under this standard, the administrator's decision will not be disturbed if it is reasonable, even if the court would have come to a different conclusion. *Haley v. Paul Revere Life Ins. Co.*, 77 F.3d 84, 89 (4th Cir. 1996). In this context, a decision is reasonable if it "is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir. 1997) (quoting *Bernstein v. Capital Care, Inc.*, 70 F.3d 783, 787 (4th Cir. 1995)). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. of New York v. N.L.R.B.*, 305 U.S. 197, 229 (1938) (citations omitted).

In the case at hand, the parties agree that the discretion given defendants by the Plan was sufficient to trigger the abuse of discretion standard. Hale argues, however, that the court should review defendants' actions using a modified abuse of discretion standard. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 11-13.) Where the plan administrator has a conflict of interest, namely, if the administrator processes and pays the claims from an insurer-funded

Case 1:04-cv-00054-GMW-PMS    Document 46    Filed 12/22/05    Page 25 of 29    Pageid#: 936

plan in exchange for a premium from the employer, then the abuse of discretion standard must be modified to account for an accompanying potential for partisanship. *See Bedrick By & Through Humrickhouse v. Travelers Ins. Co.*, 93 F.3d. 149, 152 (4th Cir. 1996) Although Broadspire is the Plan Administrator in this case for initial determinations and first-level appeals, it does not insure AEP for payment of LTD benefits. (R. at 158, 332, 384-85.) In fact, the Plan explicitly states that the Plan is entirely funded by AEP. (R. at 332.) Where a claim administrator does not fund LTD benefits but merely administers the Plan, there is no conflict of interest. *See Williams v. UNUM Life Ins. Co. of Am.*, 250 F.Supp. 2d 641, 646 (E.D. Va. 2003). Moreover, the final decision to award or deny benefits lies not with Broadspire but with the Appeal Committee, (R. at 395-96), and there is no evidence before the court that the Appeal Committee operated under a conflict of interest. Therefore, the court will review defendants' denial of Hale's claim for LTD benefits using the abuse of discretion standard.

## B. Substantial Evidence Supports Defendants' Decision

Hale argues that defendants' denial of her claim for disability constituted an abuse of discretion. (Plaintiff's Brief at 13-17.) As noted above, for Hale to prevail on this claim, she must show that defendants' decision was not supported by substantial evidence.

The Plan requires a claimant to be disabled from any occupation for which she is qualified by education, training or experience in order to receive LTD benefits beyond 24 months. (R. at 466.) Having reviewed the records, the court finds that

substantial evidence supports defendants' decision to deny Hale's request for a continuation of LTD benefits. Here, the records submitted to defendants were largely devoid of any objective evidence supporting Hale's assertion that she was disabled from any occupation but primarily consist of Hale's self-reports of limitation to her primary care physician, Dr. Craven. In fact, Hale admitted on several occasions that her depression had improved, and Dr. Patel noted on April 1, 2002, that Hale appeared to be stabilizing, euthymic, pleasant and cooperative, less anxious and less depressed. (R. at 195-96, 198, 231-33.) On November 12, 2002, when Dr. Patel performed a psychiatric evaluation on Hale, he noted that Hale was tearful at times but that her other cognitive functions appeared to be quite intact and normal. (R. at 237.) Dr. Patel also believed that Hale's depressive symptoms were situational. (R. at 231.) Furthermore, a neurologic evaluation conducted by Dr. Morgan on April 25, 2002, was normal except for some decreased range of motion in Hale's neck and a report of tenderness in the posterior cervical muscles along the base of Hale's skull. (R. at 243.) Another neurologic exam on Hale performed by Dr. Morgan on July 18, 2002, also was within normal limits. (R. at 239.)

Although Dr. Craven imposed significant restrictions on Hale in his Attending Physician's Statements, Estimated Functional Capacities Evaluation and Estimated Physical Abilities form, the court finds these limitations inconsistent with the substantial weight of the evidence. Lockridge's Functional Capacity Evaluation, for example, dated May 11, 1999, indicated that Hale could work with restrictions and limited Hale to lifting 20 pounds from floor to shoulder occasionally and 15 pounds on a frequent basis. (R. at 292-93.) Lockridge further found that Hale could push and pull 30 pounds of force but not weight and could sit for two hours. (R. at 292-

-27-

93.) Lockridge's evaluation also suggested possible symptom magnification. (R. at 291.)

As defendants emphasize, every independent medical professional concluded that Hale was not disabled from working in any occupation. (Defendants' Memorandum In Support Of Their Motion For Summary Judgment, ("Defendants' Brief"), at 49.) After evaluating Hale and reviewing Hale's x-rays, Dr. Jewell determined that Hale was capable of sedentary and light work at full capacity and moderate work at partial capacity. (R. at 258.) Dr. Jewell further found that Hale's pushing/pulling and carrying was limited to items weighing 30 pounds. (R. at 258.) Dr. Jewell also found that Hale could walk for one hour at a time during a six-hour workday, stand for one hour at a time during a six-hour workday and sit for two hours at a time in a seven-hour workday. (R. at 258.) Despite the fact that Dr. Jewell believed the objective data supported Hale's subjective complaints, he ultimately determined that Hale could return to job activities. (R. at 255-56.)

During the first-level appeal, Dr. Mazal and Dr. Burnstein, both independent medical professionals, also concluded that Hale was not disabled from any occupation. (R. at 315-32, 348, 362-66.) Dr. Ennis and Dr. Mendelssohn reached the same conclusion at the second-level appeal stage. (R. at 336-46.) Dr. Mendelssohn highlighted the absence of objective evidence to support a complete limitation in Hale's psychological functioning. (R. at 342.) Dr. Rangaswamy, the independent medical professional that reviewed Hale's record for the Appeal Committee, also determined that Hale was not disabled from any occupation based

on the lack of objective medical documentation to support a finding of total disability. (R. at 375-77.) Therefore, the court finds that substantial evidence supports the defendants' conclusion that Hale was not disabled from working in any occupation.

### C. Attorney's Fees

Finally, Hale argues that she is entitled to an award of attorney's fees. (Plaintiff's Brief at 22-23.) In ERISA cases, however, an award of attorney's fees may be granted only to the prevailing party. *See Martin v. Blue Cross & Blue Shield*, 115 F.3d 1201, 1210 (4th Cir.1997). Because Hale is not entitled to summary judgment on any of her substantive claims, she is not a prevailing party and is not entitled to attorney's fees at this time.

### IV. Conclusion

Based on the above, I find that substantial evidence supports defendants' finding that Hale was not disabled. Therefore, I will overrule Hale's motion for summary judgment, grant Defendants's motion for summary judgment and sustain defendants' decision denying benefits.

An appropriate order will be entered.

DATED:    This _2/_ day December, 2005.

_Glen M. Williams_

SENIOR UNITED STATES DISTRICT JUDGE